## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **THERESA AMEY**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09 C 2712 |
| v. | ) | |
| | ) | Magistrate Judge |
| **MICHAEL J. ASTRUE**, | ) | Martin Ashman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Theresa Amey ("Plaintiff" or "Ms. Amey") seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act.  Before this Court is Plaintiff's Motion for Summary Judgment and the Commissioner's Motion for Summary Judgment.  The parties have consented to have this Court conduct any and all proceedings in this case, including entry of final judgment.  28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c).  For the reasons discussed below, the Court finds that both motions are granted in part and denied in part.

## I.  Legal Standard

In order to qualify for SSI or DIB, a claimant must demonstrate that he is disabled.  An individual is considered to be disabled when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. *Id*. Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A claim of disability is determined under a five-step analysis. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. First, the SSA considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(4)(I). Second, the SSA examines if the physical or mental impairment is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(4)(ii). Third, the SSA compares the impairment to a list of impairments that are considered conclusively disabling. 20 C.F.R. § 404.1520(4)(iii). If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id*. Fourth, the SSA assesses the applicant's RFC and ability to engage in past relevant work. 20 C.F.R. § 404.1520(4)(iv). In the final step, the SSA assesses whether the claimant can engage in other work in light of his RFC, age, education and work experience. 20 C.F.R. § 404.1520(4)(v).

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971). The court reviews the entire record, but does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

## II.   <u>Procedural History</u>

Plaintiff filed an application for disability benefits on February 15, 2005, alleging that she became disabled as of October 2, 2003. The Social Security Administration ("SSA") denied the claim initially and again on reconsideration, following which a hearing was held before administrative law judge ("ALJ") John Mondi on November 14, 2006. Ms. Amey was represented by counsel. On February 23, 2007, the ALJ denied Ms. Amey's claim. However, the Appeals Council vacated the decision on the grounds that the ALJ: (1) failed to adequately assess Plaintiff's obesity; (2) did not properly consider her depression; (3) did not include a function-by-function assessment of Plaintiff's ability to work; and, (4) failed to address all the factors required in assessing her credibility. The case was remanded to the ALJ, who held a supplemental hearing on June 5, 2008. On January 8, 2009, the ALJ issued his second decision finding that Ms. Amey was not disabled. This time, Plaintiff's request for review was denied by the Appeals Council, and the ALJ's opinion became the Commissioner's final decision. Ms. Amey filed the instant action on May 4, 2009.

### III.  Factual Background

Plaintiff was given seven extensions of time to file this motion, which she submitted nearly two-and-a-half years after her initial filing.  Despite this exceptional length of time, neither Plaintiff nor the Commissioner has provided any account of Ms. Amey's medical history or of critical portions of the record, such as the reports of various state agency physicians or her own treating physicians.  The omission of such a discussion is especially problematic in this case because Plaintiff submitted medical records to the ALJ that extend as far back as July 12, 1987. (R. 318).  The relevance of much of this material is unclear, as Ms. Amey alleges that her onset date was October 2, 2003.  The Court limits its discussion primarily to those records after October 2, 2003 that concern Ms. Amey's obesity, asthma, depression, and Arnold-Chiari malformation ("Chiari malformation"), which the ALJ found at Step 2 constituted a severe impairment when considered in combination with one another.

### A.  Medical History

Ms. Amey was a thirty-five year old single mother of three children at the time she allegedly became disabled.  Standing five feet and three inches, she weighed 307 pounds at the time of the first hearing. (R. 470).  After graduating from high school and cosmetology school, Ms. Amey worked as a hair cutter from approximately 1990 until she allegedly became disabled. (R. 467).  Her only other work during that time included seasonal jobs with United Parcel Service. (R. 468).

Ms. Amey was diagnosed with Chiari malformation as early as October 28, 2002. (R. 406).  Chiari malformations are structural defects in the cerebellum, which controls balance.

Such malformations can cause numbness and other abnormal sensations in the arms and legs, dizziness, vomiting, vision problems, neck pain, balance problems, depression, and headaches. *See* http://www.ninds.nih.gov/disorders/chiari. Dr. Sam Marzo noted that Ms. Amey had suffered from severe headaches since childhood, often on a weekly basis. She also experienced vomiting, dizziness, and disequilibrium. Dr. Marzo attributed all of these symptoms to Chiari malformation, which was shown by means of a MRI of Ms. Amey's head. (R. 405-06). Subsequent studies confirmed the existence of a Chiari malformation. (R. 186, 189, 341).

On June 10, 2005, Dr. C. J. Wonais concluded that Ms. Amey's disorder accounted for the pain in her back, shoulders, and hands, as well as a temporary blindness that she formerly experienced in both eyes for short periods. (R. 138). Dr. Wonais also noted that Chiari malformation explained Ms. Amey's repeated balance problems, many of which resulted in falls that led to contusions. (*Id.*). The record shows that on November 7, 2004, Ms. Amey sought emergency treatment for a fall that appeared to result from numbness in her legs. (R. 174). She had earlier sought similar emergency treatment for an incident in 1997, when she fell in her shower. (R. 225, 245). In addition, dizziness and balance problems were noted by physicians in 2004 and 2005. (R. 178, 413).

Ms. Amey was also diagnosed with a syrinx, or syringomylelia, which is often associated with Chiari malformation and involves a fluid buildup in the upper spinal cord, causing numbness, headache, and limb pain. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0002373. Ms. Amey was prescribed Advil and the muscle relaxant Flexeril to treat the pain and stiffness that resulted from her disorder. (R. 414). She was also prescribed the antidepressant amitriptyline to treat her muscle and headache pain.

In addition to complications stemming from Chiari malformation, Ms. Amey has a history of breathing problems stemming from asthma. She was first diagnosed with asthma in 1995. (R. 138). Although the record contains little information concerning her condition, Dr. Wonais noted that she is required to seek emergency treatment for her asthma five times a year, though she has never been hospitalized for it. (*Id.*). She was treated in the past with the steroid prednisone, but since 1999 she has been prescribed the bronchodilator Albuterol to control her asthma symptoms. (R. 381).

Ms. Amey also has a documented history of major depression. Although the record evidence is not entirely clear, she appears to have been first diagnosed with this disorder in May 1999, when a treatment note for a gynecology exam stated that she was depressed and experienced suicidal ideation. (R. 384). On November 2, 2005, Dr. Michael Gill noted that Ms. Amey had been on antidepressant medications "for years" but had stopped using Paxil one-and-a-half years prior to their interview. (R. 331). He diagnosed her as depressed and noted that she could start once again on Prozac to remedy her symptoms. (R. 336).

In November 2007, Ms. Amey began treatment with psychiatrist Dr. Huma Pandit through the DuPage, Illinois County Health Department. Dr. Pandit noted that Ms. Amey's mood level averaged a five out of ten, but that it could drop as low as one or two out of ten. (R. 434). Her sleep was erratic, and she had passive suicidal ideation combined with erratic sleep and feelings of worthlessness. (*Id.*). Dr. Pandit diagnosed her with recurring depression and began treatment with Lexapro, together with Trazadone to help Ms. Amey sleep. (R. 436). By January 2008, she was showing signs of improved mood and sleep. (R. 432). At some point that is not clear in the record, Dr. Pandit switched Ms. Amey's medication from Lexapro to

Cymbalta, and she continued to show improvements in her mood by March 2008. (R. 426). It is unclear whether Ms. Amey completed her treatment with Dr. Pandit successfully, as the last medical record dated June 30, 2008 shows that she failed to appear for her appointment with the psychiatrist. (R. 423).

### B.   Consulting and State Agency Physicians' Reports

The record also contains a number of reports from consulting physicians, as well as state agency reports concerning the limitations imposed by Ms. Amey's impairments. On June 15, 2005, Dr. Madala Vidya issued a physical RFC for the SSA. Dr. Vidya noted that Ms. Amey suffered from a Chiari malformation, syringomylelia, scoliosis, headaches, severe back and arm pain, balance and vision problems, shoulder and neck pain, asthma, and depression. (R. 147). Dr. Vidya concluded that Ms. Amey could lift fifty pounds occasionally and twenty-five pounds frequently, that she could sit and stand up to six hours a day, and had an unlimited ability to push and pull. (R. 141). However, several postural limitations were noted on her ability to climb, balance, stoop, and kneel. (R. 142).

On November 2, 2005, Ms. Amey met with consulting psychologist Dr. John Peggau. Dr. Peggau noted that she showed a good mood and had good short and long-term memory. Dr. Peggau did not specifically diagnose Ms. Amey as suffering from depression. (R. 208). On November 21, 2005, Dr. Patricia Beers completed a Psychiatric Review Technique ("PRT") form for the SSA concerning Ms. Amey's depression. The PRT contains only one notation, and it indicates that Ms. Amey did not have a medically determinable impairment. (R. 210).

Several years after these psychiatric reports were completed, Ms. Amey was assessed by consulting psychiatrist Dr. Joseph Nemeth on February 25, 2008.  Dr. Nemeth noted Plaintiff's treatment with Dr. Pandit, as well as her history of medication for depression.  After accounting for her subjective complaints of sadness and low motivation, together with signs of slow speech and poor concentration during the interview, Dr. Nemeth diagnosed Ms. Amey as having a major depressive disorder, as well as obesity, asthma, Chiari malformation, and spiromyalgia. (R. 417).  The psychiatrist found that Ms. Amey's mental problem, together with her reports of vertigo, back pain, and numbness in her extremities, created a marked limitation in her ability to carry out complex instructions.  Her mental impairment also imposed "mild" limitations on her ability to interact appropriately with supervisors, the public, and co-workers. (R. 418-19).

### C.    Plaintiff's Testimony

Ms. Amey testified that she had worked as a hair cutter from around 1990 through September 2003.  Although her alleged onset date was October 2, 2003, she left her job in September of that year because she was pregnant. (R. 468).  She described her physical symptoms as involving pain in her neck and lower back, with numbness and tingling in her extremities.  Her body tends to "lock up" upon exertion, and she must take muscle relaxants to alleviate her condition.  Special problems arise when she sits for long periods of time; under these conditions her body becomes stiff, with increased pain in her back and legs. (R. 523).  Ms. Amey stated that her gait is frequently unsteady because of dizziness and balance problems, and she has a tendency to fall. (R. 480-82).

She described the primary limitation of her obesity as increased difficulty in climbing stairs but gave little description of her asthma and depression-related problems. (R. 475, 478). Her headaches, however, impose greater restrictions. Ms. Amey testified that she experiences severe headaches about twice a day, with each episode lasting approximately ten minutes. Coughing and bending are often triggers for these episodes, which require her to lie down until they are over. (R. 487-88).

Ms. Amey stated that she could lift up to fifty pounds. However, she made clear that she could stand for only ten to fifteen minutes before experiencing unsteadiness, and that she could sit for only twenty minutes at a time. (R. 470). Ms. Amey is able to care for her family "sometimes," but she requires her children's help to do tasks like grocery shopping, climbing stairs, or day-to-day chores around the home. (R. 473). Most of her day is taken up with trying to carry out such tasks, and she is required to sit down frequently to perform them. (R. 474). Ms. Amey experiences bouts of fatigue each day and must take naps once or twice during the day. (R. 477). The side effects of her medications, particularly those related to the muscle relaxant Flexeril, exacerbate the tiredness, sleepiness, and grogginess she experiences. (R. 518).

At the second administrative hearing, the ALJ questioned Ms. Amey concerning her past work history. Although she claimed not to have worked since 2003, Ms. Amey filed a tax return in 2004 that reported an income of $12,794.23.[1] Ms. Amey's explanation for this return was exceptionally unclear, but she appears to have filed the return at the suggestion of a family member even though she did not earn more than $200 for cutting hair for family and friends. Ms. Amey stated that she later informed the IRS that she had not, in fact, earned the income

---

[1] The ALJ incorrectly referred to this amount in his decision as $1,794.23. (R. 15).

reported on the return. (R. 507). She did not pay taxes on the phantom income stated on the tax return, and the IRS did not pursue the matter after she informed that agency that she had not earned the reported amount. (R. 507-08).

### D.     The VE's Testimony

Testimony was also given at the supplemental hearing by VE Frank Mendrick. Mr. Mendrick stated that Ms. Amey's former work as a hairstylist was semi-skilled work that is generally performed at the light level. However, Ms. Amey's description of her former job duties indicated that she had performed it at the medium exertional level on some occasions, though she also worked at a light level on others. (R. 530-31).

The ALJ posed several hypothetical questions to the VE. First, he asked the ALJ to assume an individual who is limited to light work with certain environmental restrictions. The ALJ also asked the VE to assume someone who had a marked limitation in the ability to carry out complex instructions and mild restrictions in the areas of interacting appropriately with supervisors, co-workers, and the public and a mild limitation in the capacity to respond appropriately to unusual or changing work situations. The ALJ responded that such an individual could not perform Ms. Amey's past work but that 2,500 inspection jobs existed in the Chicago area that she could perform, as well as 4,500 hand labor jobs and 5,500 general assembly positions. (R. 532-32).

The ALJ then modified the terms of the hypothetical to reflect an individual who could only undertake sedentary work. The VE responded that 32,000 assembly jobs existed, as well as 1,200 inspection jobs and 1,500 hand laborer position. (R. 532). If all of the restrictions claimed

by Ms. Amey were fully credited, however, she would be precluded from all work. (R. 533).
The ALJ made no inquiry as to whether the VE's testimony conflicted with information provided
in the Dictionary of Occupational Titles ("DOT").


### E.     The ALJ's Decision

On January 8, 2009, ALJ John Mondi issued his decision finding that Ms. Amey was not
disabled. Following the five-step evaluative process, the ALJ found at Step 1 that Ms. Amey
had not engaged in substantial gainful activity since her alleged onset date of October 2, 2003.
At Step 2, he did not find that depression, asthma, Chiari malformation, or obesity constituted
severe impairments when taken individually, but that they were severe when considered in
combination. Despite this aggregate finding, the ALJ continued to Step 3 to find that no
impairment met or medically equaled a Listing, without stating whether he was considering the
combined impact of the impairments identified at Step 2. Before proceeding to Step 4, the ALJ
determined that Ms. Amey's testimony was not credible. He also found that she had the capacity
to work at the light exertional level, but that her affective disorder limited her "to simple one,
two step jobs" without the ability to understand, remember, and carry out detailed instructions.
(R. 18). Based on these findings, the ALJ concluded that Ms. Amey was unable to perform her
past relevant work. After questioning the VE, the ALJ then found at Step 5 that Ms. Amey had
the RFC to perform jobs that exist in the national economy in significant numbers. As a result,
Ms. Amey was found to be not disabled.

### IV.  Discussion

Ms. Amey contends that the ALJ: (1) failed to account at Step 2 for the functional limitations each of the impairments identified at that step entailed; (2) erred in his Step 3 analysis on multiple grounds; (3) improperly assessed her credibility; (4) failed to properly state the RFC or the ALJ's reasons for it; and, (5) erred in his hypothetical questions posed to the VE.

### A.     The Step 2 Issue

At Step 2, an ALJ must determine whether a claimant has a medically determinable impairment, or a combination of impairments, that is severe.  20 C.F.R. § 404.1520(c).  An impairment is not severe if it does not significantly limit an individual's ability to perform basic work activities.  20 C.F.R. § 404.1521(a).  A finding at Step 2 that a medical condition is severe "is merely a threshold requirement."  *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999).  By finding one impairment to be severe, an ALJ is obligated to consider the combined effect of all of a claimant's impairments, both severe and non-severe, at later stages.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [claimant's] impairments was 'severe,' the ALJ needed to consider the aggregate effect of this entire constellation of ailments – including those impairments that in isolation are not severe") (emphasis omitted); *see also Raines v. Astrue*, No. 06-cv-0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007) ("As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe'"); *Newell v. Comm. of Social Security*, 347 F.3d 541, 546 (3d Cir. 2003) ("The step-two inquiry is a *de minimis* screening device to dispose of groundless claims").

The ALJ found that Ms. Amey's depression, asthma, Chiari malformation and obesity "at least in combination are severe."[2] (R. 16). Plaintiff does not contest this finding, nor does she claim that any of her disorders should have been found to be severe when considered individually. Instead, she argues that SSR 96-3p required the ALJ to undertake a functional analysis of the limitations each of her impairments imposed, either when taken individually or in combination. The Commissioner contends that SSR 96-3p is inapplicable to this issue; according to the Commissioner, SSR 96-8p states the appropriate standard for the functional analysis Ms. Amey references, and it applies only to a RFC determination, not to a Step 2 discussion.

Neither of these arguments is persuasive. The Commissioner overlooks that SSR 96-8p does not address the "functional" analysis Ms. Amey relies on for her Step 2 argument. Instead, SSR 96-8 requires an ALJ to carry out a "function-by-function" assessment of a claimant's work-related abilities and is used to determine whether the claimant can perform her past relevant work at Step 4. This includes the functions described in paragraphs (b), (c), and (d) of 20 C.F.R. § 404.1545. By contrast, SSR 96-3p "requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions" as part of a severity finding at Step 2. SSR 96-3p. Such an assessment only involves a determination of whether an impairment has "more than a minimal effect" on a claimant's ability to work. SSR 96-3p. Contrary to the Commissioner's argument, courts have frequently acknowledged

---

[2] The Commissioner incorrectly claims that the ALJ found that Ms. Amey's depressive disorder was severe. The ALJ only determined that depression, asthma, obesity, and Chiari malformation combined to create a severe impairment; he did not find that any single impairment, including depression, was in itself severe. (R. 16).

that SSR 96-3p applies to an ALJ's Step 2 analysis. *See*, *e.g.*, *Beach v. Astrue*, No. 09 C 2897, 2010 WL 3168292, at *8 (N.D. Ill. Aug. 4, 2010) ("It is true that SSR 96-3p requires an evaluation of the functionally limiting effects of an [individual's] impairment(s)") (internal quote and citation omitted).

Plaintiff is correct in stating that the ALJ provided no discussion of these functional issues referenced in SSR 96-3p as part of his Step 2 finding. This does not mean, however, that remand is warranted. The ALJ noted in other parts of the decision the limitations stemming from Ms. Amey's mental impairment, as well as at least some medical evidence concerning her range of motion and other medical symptoms. (R. 18). An ALJ is not required to evaluate every piece of evidence in his written decision, especially at Step 2. As long as the ALJ proceeds to Step 3, the absence of a discussion on the functional limitations noted in SSR 96-3p is not reversible error. *Beach*, 2010 WL 3168292, at *8; *Morgan v. Astrue*, No. 07 C 1741, 2009 WL 650364, at *8 (N.D. Ill. March 9, 2009), *vacated on other grounds*, 393 Fed.Appx. 371 (7th Cir. 2010).

The *de minimis* nature of the standard governing Step 2 persuades the Court that remand is not warranted on this issue. At a minimum, Plaintiff must show that remanding this case on the severity issue would result in a different conclusion because remand is not required "unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). Given that the ALJ found at least one severe impairment at Step 2 and was required to proceed to Step 3, remand is not warranted, and the Commissioner's motion is granted on this point.

B.     **The Listing Issue**

Ms. Amey argues that the ALJ erred at Step 3 by (1) failing to identify a specific Listing, (2) omitting findings concerning her non-severe physical impairments, and (3) not employing the "special technique" provided in 20 C.F.R. § 404.1520a for evaluating mental impairments.  At Step 3, an ALJ must consider whether a claimant's impairments meet or medically equal one of the Listings set forth in Appendix 1 of the regulations.  A claimant's impairment meets a Listing only if it satisfies "all of the criteria for a listed impairment" or the claimant "present[s] medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002) (internal quote and citation omitted).  "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

When considering whether a mental impairment exists, the SSA applies the special technique at each level of the administrative process.  20 C.F.R. § 404.1520a(a).  An ALJ does so by first determining that an impairment actually exists based on a claimant's signs and symptoms established by the Paragraph A criteria.  20 C.F.R. § 404.1520a(b)(1).  He then evaluates its severity by reference to the "Paragraph B criteria" set forth in Listing 12.00C.  20 C.F.R. § 404.1520a(c)(2).  These criteria include four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  20 C.F.R. Pt. 404, Supbt. P, App. 1 § 12.00C.  The first three of these components must be rated by the ALJ on a five-point scale as none, mild, moderate, marked, or extreme.  The fourth area is rated on a four-point scale as none, one or two, three, or four and

more. 20 C.F.R. § 404.1520a(c)(4). If an ALJ finds that a claimant's limitations in the first three functional areas should be rated as "none" or "mild," together with a finding of "none" in the fourth area, he is entitled to conclude that a mental impairment is not severe unless other evidence suggests a limitation that is more than mild. 20 C.F.R. § 404.1520a(d)(1). An ALJ must specifically indicate the findings for each functional area and incorporate all of a claimant's significant medical history. *Craft*, 539 F.3d at 675.

Ms. Amey's claim that the ALJ failed to apply this test at Step 3 is incorrect. Although the ALJ omitted the special technique at Step 2 (which Plaintiff does not claim was erroneous), he did use it at Step 3 to find that Ms. Amey had mild limitations in her activities of daily living, moderate limitations in her concentration, no restrictions in social functioning, and no episodes of decompensation. (R. 16). Accordingly, the ALJ found that Ms. Amey's mental impairment did not meet or medically equal Listing 12.04.

Recognizing this fact, Ms. Amey argues in the alternative that the ALJ improperly applied the special technique because he failed to give controlling weight to her treating psychiatrist, Dr. Pandit. Ordinarily, an ALJ is required to give controlling weight to a claimant's treating physician if it is well-supported and is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). In this case, however, Ms. Amey fails to provide any argument on why Dr. Pandit's "opinion" was relevant to the ALJ's consideration of the special technique. Dr. Pandit's records show that he diagnosed Ms. Amey with depression, treated her with medication, and found that her symptoms improved. (R. 423-36). He did not give any opinion concerning the limitations her mental condition imposed on Ms. Amey.

- 16 -

Plaintiff overlooks that Dr. Nemeth, on whom the ALJ relied, also determined that Plaintiff suffered from major depression and, after noting Dr. Pandit's treatment history, assessed her functioning in ten areas. He found mild limitations in her ability to interact with the public, supervisors and co-workers, a mild limitation in her ability to respond to changes in her work setting, and a moderate limitation in her capacity to carry out complex instructions. (R. 418-19). The ALJ appropriately noted these findings and relied on them to find that Plaintiff did not meet or equal Listing 12.04. Ms. Amey presents no objections to the ALJ's reliance on Dr. Nemeth's report. Thus, even if the ALJ erred by not weighing Dr. Pandit's report, his mistake was harmless error because other substantial evidence supports the ALJ's finding at Step 3.[3]

That said, Ms. Amey correctly notes that the ALJ failed to provide any discussion at Step 3 about the impairment he actually found to be severe – the combined effect of her depression, obesity, asthma, and Chiari malformation. An ALJ, of course, must evaluate whether a claimant's impairments, or combination of impairments, meet or medically equal a

---

[3] It is unclear why the ALJ discussed Ms. Amey's mental impairment at such length at Step 3, but gave *no* consideration to her other non-severe impairments of obesity, asthma, and Chiari malformation. Courts have split on whether an ALJ must determine if impairments that were found to be non-severe at Step 2 meet or equal a Listing at Step 3. *Compare Alesia v. Astrue*, 789 F. Supp.2d 921, 932-33 (N.D. Ill. 2011) ("Here, the ALJ need not consider whether Claimant medically equals a listed mental disorder unless he concludes at step two that she has a severe mental impairment"); *Dively v. Astrue*, No. 10-170J, 2011 WL 1399082, at *3 n.2 (W.D. Pa. April 12, 2011); *Hogarth v. Astrue*, No. 07 cv 02106, 2009 WL 973557, at *5 (D. Colo. April 9, 2009) *with Humphrey v. Astrue*, No. 1:09-cv-1261, 2011 WL 221870, at *6 (S.D. Ind. Jan. 21, 2011); *Hair v. Astrue*, No. 5:10 CV 309, 2011 WL 2681537, at *5-6 (E.D.N.C. June 16, 2011). As neither party addresses this issue, the Court does not discuss Ms. Amey's claim that the ALJ erred in not determining if her non-severe physical impairments met or equaled a Listing. The Court notes, however, that at Step 3 the ALJ refers in the plural to Plaintiff's "impairments." Insofar as he intended the Step 3 discussion to include all of Ms. Amey's nonsevere physical impairments, the ALJ was required to identify the Listings in question and state why Ms. Amey did not meet or medically equal their requirements. On remand, the ALJ shall clarify the scope of his Step 3 determination.

Listing. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). The regulations require an ALJ to "compare your findings with those for closely analogous listed impairments" when (1) a claimant has a combination of impairments, and no one of them is identical to a Listing, or (2) the claimant has an impairment that is not otherwise described in Appendix 1. 20 C.F.R. § 404.1526(b)(2) & (3). Ms. Amey contends that the ALJ's failure to address this requirement is reversible error.

The Commissioner claims in general terms that the ALJ considered the aggregate impact of Plaintiff's impairments. However, the ALJ's Step 3 discussion refers only to Plaintiff's depressive disorder and omits any reference to Ms. Amey's physical limitations or the combined impact of Ms. Amey's various impairments. (R. 16-17). The Commissioner presents no argument on the ALJ's failure to identify a Listing analogous to the severe disorder identified at Step 2. Having determined at Step 2 that the combined effect of Plaintiff's asthma, obesity, Chiari malformation, and depression constituted a severe impairment, the ALJ was required to identify the most closely analogous Listing for her combined impairment and to discuss why that Listing was not met or medically equaled.

Although the ALJ did not comply with either of these requirements, the Commissioner claims that substantial evidence supports the Step 3 conclusion because the ALJ stated that he relied on the assessments of the state agency physicians. The ALJ did not identify these physicians, but the Commissioner directs the Court's attention to disability determinations dated November 28, 2005 and July 13, 2005 by Dr. Stanley Burris and Dr. Vidya Madala, both of whom found that Ms. Amey was not disabled. (R. 29-33). The Commissioner correctly notes

- 18 -

that such determinations can support an ALJ's finding that a Listing is not met or equaled. *See Fox v. Heckler*, 776 F.2d 738, 742 (7th Cir. 1985).

In this case, however, both of the physicians cited by the Commissioner only assessed Plaintiff's asthma. (R. 30, 32). The medical forms relied on by the Commissioner do not suggest that either Dr. Burris or Dr. Madala considered Chiari malformations, obesity, and depression, or that these state agency physicians assessed the combined impact of the various impairments that was found by the ALJ to be severe. Indeed, the forms specifically state that asthma was the primary diagnosis, and they include the notation "none" in the boxes provided for "secondary diagnosis." Both forms also omit any entry for boxes that allow the medical reviewer to indicate that "combined multiple" impairments were considered. Thus, these forms are not substantial evidence for the ALJ's Step 3 conclusion.

Without any reference to a Listing concerning Plaintiff's physical impairments, much less to one that is most analogous to the aggregate effect of her physical and mental disorders – all of which the ALJ found combined to create a severe impairment – the Court cannot determine what consideration, if any, the ALJ gave to the severe impairment he found to exist at Step 2. As courts have stated, an ALJ must meet three requirements at Step 3. He must: (1) discuss the relevant Listing by name; (2) provide more than a perfunctory discussion of it; and, (3) consider the opinion of a medical expert to determine if an impairment medically equals a Listing. *Cirelli v. Astrue*, 751 F. Supp.2d 991, 1002 (N.D. Ill. 2010) (citing *Barnett*, 381 F.3d at 668-670). The ALJ's failure to identify a closely-analogous Listing prevents the Court from concluding that the ALJ's oversight was merely harmless error and that he would find on remand that Ms. Amey's

severe impairment does not meet or equal that Listing once it is identified.  Accordingly, remand is warranted on the Step 3 issue, and Plaintiff's motion is granted on this point.

### C.    The Credibility Issue

Ms. Amey also contends that the ALJ erred by finding her statements at the hearing to be non-credible.  A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678.  An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements.  SSR 96-7p; *see also Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (stating that an ALJ "must articulate specific reasons for discounting a claimant's testimony as being less than credible.").  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  A reviewing court must be mindful that reversal on this ground is appropriate only if the credibility determination is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 F.3d at 413-14.

In making his credibility determination, the ALJ considered the fact that Ms. Amey filed a tax return in 2004 that reflected an income of $12,794.23, an amount that was much greater than what she actually earned as a hair stylist working part-time.  The ALJ characterized the 2004 return in his decision as "false." (R. 17).  Plaintiff argues that it is not clear that the return was really fraudulent and that the ALJ was not entitled to use it to discount her credibility.

This claim is without merit and directly contradicts Ms. Amey's own testimony at the supplemental hearing. Ms. Amey admitted that she never earned the $12,794.23 she reported to the IRS, agreed with the ALJ that the reported number was "fake" and "false," and stated that her actual earnings were less than $200. (R. 503, 507). As the ALJ noted, Ms. Amey's testimony on this issue was also inconsistent. (R. 15). She stated, for example, that she earned no income at all in 2004, but then admitted that she earned small amounts of money. She also stated that another person made up the figure of $12,794.23, while later testifying that she herself did so. (R. 499-507). The ALJ was entitled to rely on these inconsistencies and on her 2004 return as evidence that her testimony was not credible.

Ms. Amey objects to the ALJ's finding that her claim to be disabled was also undermined by the fact that she did some part-time hairstyling work out of her home during 2004. She argues, for instance, that the ALJ improperly concluded that she left her last full-time job in 2003 because she was pregnant, not as a result of difficulties imposed by her various impairments. Again, however, this claim contradicts Plaintiff's own testimony. Ms. Amey stated at the first hearing that her pregnancy was the reason she left her job. *See* Record at 468 ("Because I was pregnant at the time, so I left").

Ms. Amey further objects to the ALJ's finding that an inconsistency existed between her statement that she could only sit for twenty minutes at a time and the fact that she actually sat "throughout a much longer hearing." (R. 18). According to Ms. Amey, the ALJ's characterization of her testimony on her capacity to sit only for short periods of time contradicts the record. However, she clearly stated that she could sit "[m]aybe the most, like – about 20 minutes before I have to stand up." (R. 470).

- 21 -

Equally misplaced is Plaintiff's contention that the ALJ created "an irreconcilable inconsistency" between his Step 1 finding that she had not engaged in substantial gainful activity since her onset date, and his finding that she did some hair styling work in 2004. Substantial gainful activity is defined as work involving "significant physical or mental activities." 20 C.F.R. § 416.972(a). Ms. Amey fails to note that such work must yield a monthly income greater than that provided under the complex formula stated in the regulations, which adjusts the figure of $700 per month according to various national factors. *See* 20 C.F.R. § 416.974(b)(2)(i). Ms. Amey's testimony that she only earned $200 in 2004 shows that she did not meet this requirement and never engaged in any substantial gainful activity after leaving her last job.

Finally, Plaintiff claims that the ALJ failed to consider the credibility factors set forth in SSR 96-7p, as described above.[4] However, the ALJ did give some attention to her activities of daily living, medication history, and at least some of the medical evidence related to her impairments. The ALJ's account of these factors was far from exhaustive. He failed to consider, for example, the side effects of Plaintiff's medications or the consistency between all of her subjective complaints and the medical evidence. That said, the issues cited by the ALJ concerning Plaintiff's testimony are not insignificant matters that he was required to set aside in

―――――――――――――

[4] Plaintiff provides little argument on the SSR 96-7p issues, relying instead on essentially conclusory allegations. In particular, she does not raise any issue concerning the degree to which the ALJ may have overlooked the consistency between her subjective allegations concerning her Chiari malformation and the medical evidence. Although Ms. Amey raises this argument in her objections to the ALJ's RFC finding, she does not assert it in relation to the credibility issue. The Court does not consider issues that have not been raised by Plaintiff. As discussed below, however, some of Ms. Amey's testimony about her Chiari-related symptoms are well documented in the record. On remand, the ALJ will be required to give further consideration to this evidence in revisiting the RFC issue, and he will have the opportunity to determine if such evidence affects his decision that Plaintiff's testimony was non-credible in its entirety. *See* SSR 96-7p ("In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements").

- 22 -

order to find that Plaintiff's testimony was credible. Accordingly, the Court cannot conclude

that the ALJ's credibility determination is "patently wrong," *Elder*, 529 F.3d at 413-14, and the

Court must defer to the ALJ's finding. The Commissioner's motion is granted on this issue.


### D.    The RFC Issue

Before finding that Plaintiff was unable to perform her past relevant work, the ALJ

determined that Ms. Amey's physical impairments restricted her ability to work at the light

exertional level; her affective disorder was found to limit her "to simple, one, two step jobs not

requiring the ability to understand, remember, and carry out detailed instructions." (R. 18). Light

work is defined as the ability to lift up to twenty pounds and to lift or carry ten pounds

frequently. It also involves "a good deal" of walking or standing or, when sitting is required, of

pushing or pulling. 20 C.F.R. § 404.1567(b).

Plaintiff first argues that the ALJ's RFC finding errs because it does not include a

function-by-function assessment of her ability to work. Social Security Ruling 96-8p defines a

RFC determination as "a function-by-function assessment based upon all of the relevant

evidence of an individual's ability to do work-related activities." SSR 96-8p. This includes a

claimant's physical and mental ability to carry out work, as described in 20 C.F.R. §

404.1545(b), (c), & (d). *Id.* Although an ALJ is required to consider this issue, remand is not

required merely because an ALJ fails to state his findings in the item-by-item manner Plaintiff

claims. Courts in this Circuit have repeatedly rejected arguments that SSR 96-8p requires an

ALJ to articulate a claimant's RFC on a function-by-function basis. *See*, *e.g.*, *Knox v. Astrue*,

327 Fed.Appx. 652, 657 (7th Cir. 2009) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th

Cir. 2005)); *McMurtry v. Astrue*, 749 F. Supp.2d 875, 891 (E.D. Wis. 2010); *Corder v. Barnhart*, No. 03 C 9308, 2004 WL 1381125, at *6 (N.D. Ill. May 10, 2004); *Vujnovich v. Astrue*, No. 2:10-CV-43, 2011 WL 1157499, at *14 (N.D. Ind. March 28, 2011). Instead, "a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox*, 327 Fed.Appx. at 657.

As *Knox* makes clear, an ALJ satisfies SSR 96-8p's requirements when he analyzes a claimant's symptoms in light of the objective medical record. Ms. Amey argues that the ALJ failed to do so in this case in that he overlooked significant evidence related to her Chiari malformation. Although the Court cannot agree with Plaintiff's claim that the ALJ showed no understanding of this disorder at all, his decision overlooks crucial evidence concerning Chiari malformation that supports a number of the functional and non-functional limitations alleged by Plaintiff. Ms. Amey claimed, for instance, that she suffered from symptoms such as headaches, dizziness, vertigo, neck and limb pain, limb numbness, and falling. This Court does not make medical determinations concerning the etiology of such symptoms, but it notes that they are all well-documented aspects of Chiari malformation, as described above.

More importantly, the link between these symptoms and Plaintiff's Chiari malformation is amply evidenced in the medical record. For example, Dr. Marzo concluded in October 2002 that Ms. Amey's complaints of migraine-intensity headaches and dizziness were symptoms of Chiari malformation. (R. 404-06). Dr. Wonais stated in June 2005 that Ms. Amey suffered from "Arnold-Chiari Syndrome" that caused events such as lower back pain, shoulder pain, hand pain, poor balance that led to frequent falling, and muscle spasms throughout her body. (R. 138). Episodes of falling that required emergency treatment are well-documented in the record, as are

symptoms of numbness, pain, dizziness, and falling that are frequently stated to be associated with Chiari malformation. (R. 174, 178, 183, 184, 413). The ALJ took no notice of these records or of any medical evidence related to Plaintiff's headaches and dizziness. Instead, his analysis of the evidence concerning Chiari malformation was limited to a November 2, 2005 entry by Dr. Gill stating that Plaintiff suffered from that disorder. Even here, however, the ALJ did not note that Dr. Gill's entry also confirmed the tingling and lower back pain that Plaintiff testified to at the hearing. (R. 331).

The Commissioner cites the findings of Dr. Nemeth to support that portion of the RFC stemming from Ms. Amey's mental impairment, but the Commissioner does not explain how the record supports the ALJ's RFC concerning Ms. Amey's physical ability to perform light work. Like the ALJ himself, the Commissioner overlooks that Dr. Vidya provided a physical RFC assessment on June 15, 2005 that found Ms. Amey able to perform what essentially amounts to medium work. (R. 141). Dr. Vidya found that Plaintiff had limitations in her ability to climb stairs, balance, stoop, kneel, crouch, and crawl. (R. 142). The ALJ did not include these limitations in his RFC, and he did not explain his reasons for not doing so. Indeed, the ALJ failed to note the state agency physician's RFC assessment at all.

Social Security Ruling states that a "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir.

2005); *Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011). Instead of complying with this well-establish standard, the ALJ constructed his own RFC by rejecting Dr. Vidya's findings without explaining his reasons for doing so. Courts have consistently found such an unsupported finding concerning the RFC to be an improper act of "playing doctor." *See, e.g.*, *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *26-27 (Nov. 18, 2011); *Bailey v. Barnhart*, 473 F. Supp.2d 822, 839 (N.D. Ill. 2006) (finding that an ALJ who creates a RFC without supporting medical evidence plays doctor).

For these reasons, substantial evidence does not support his RFC findings, and Plaintiff's motion is granted on the RFC issue.

### E.     The VE Issue

Finally, Plaintiff argues that the ALJ failed at Step 5 by asking the VE to interpret Dr. Nemeth's mental restrictions and by not including all of her physical limitations in the hypothetical questions posed to the VE. "Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942. This includes all impairments and limitations that the ALJ accepts as credible and is supported by medical evidence. *Schmidt*, 496 F.3d at 846; *Ragsdale v. Shalala*, 53 F.3d 816, 818 (7th Cir. 1995).

In his first hypothetical question, the ALJ asked the VE to assume those limitations described by Dr. Nemeth in his psychiatric report and referred the VE to Exhibit 12F in the record. (R. 531). Ms. Amey claims this was erroneous because the ALJ was required to describe her limitations to the VE. It is clear, however, that the ALJ did just that when he carefully

defined the terms of Dr. Nemeth's assessment to the VE.  The ALJ explained that Dr. Nemeth had found that Plaintiff had a moderate limitation in her ability to carry out complex instructions, mild limitations in her capacity to interact appropriately with co-workers, supervisors, and the public, and a mild restriction in her ability to respond to changing work conditions.  (R. 531). This explanation did not require the VE to interpret Dr. Nemeth's report on his own, as Plaintiff contends.

Plaintiff also argues that the ALJ failed to incorporate all of her limitations in the hypothetical questions.  The ALJ asked the VE to assume an individual who was limited to light work.  The Commissioner claims that this was sufficient because the ALJ's hypothetical accurately reflected all of Ms. Amey's limitations.   This argument assumes that the RFC finding that Plaintiff could perform light work took account of all of Ms. Amey's limitations that are supported by the record.  As the RFC assessment itself is not supported by substantial evidence, however, it is unclear how the ALJ's hypothetical question incorporated all of Ms. Amey's medically credible limitations.  A faulty RFC finding does not provide an adequate ground for posing hypotheticals to a VE.  *See Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) ("For all of the same reasons that the RFC fell short, the hypothetical question, which was based entirely on that RFC did as well").  As noted, the ALJ failed to note the great majority of the record concerning Plaintiff's Chiari malformation and did not explain the basis for the RFC finding.  The Commissioner, who bears the burden of proof at Step 5, fails to explain how the ALJ's hypothetical question accounts for Plaintiff's limitations when the ALJ overlooked substantial portions of the medical record.[5]  Plaintiff's motion is granted on this issue.

----

[5]  The ALJ failed to ask the VE if his testimony conflicted with the DOT.  "SSR 00-4p
(continued...)

## V.    Conclusion

For the reasons stated above, both the Plaintiff's and the Commissioner's motions for summary judgment are granted in part and denied in part.  Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

_____
**MARTIN C. ASHMAN**
**Dated:** February 2, 2012.                              United States Magistrate Judge

---

[5](...continued)
requires an ALJ who takes testimony from a vocational expert about the requirements of a particular job to determine whether that testimony is consistent with the Dictionary of Occupational Titles." *Prochaska*, 454 F.3d at 735.  As Plaintiff does not raise this issue, the Court does not address any potential error resulting from the ALJ's oversight.  On remand, however, the ALJ shall ensure that the VE's testimony is consistent with the DOT.